# In the United States Court of Federal Claims

COMMUNITY WORSHIP FELLOWSHIP,

Plaintiff,

v.

THE UNITED STATES,

Defendant.

No. 19-352
Filed October 23, 2025

William L. Ghiorso, Ghiorso Law Firm, Salem, OR, for plaintiff.

Alex Schulman, Tax Division, United States Department of Justice, Washington, DC, for defendant.

**OPINION AND ORDER**
**Granting the government's motion for summary judgment**

Community Worship Fellowship (CWF) challenges the IRS's decision revoking its tax-exempt status as a 501(c)(3) charitable organization and as a church for the period from 2013 to 2016. CWF asks the court to reverse the IRS's decision and declare that the organization is tax exempt.

The government moves for summary judgment, arguing that during those tax years, CWF operated for the financial benefit of its members, primarily a single family, and did not meet the qualifications of a tax-exempt organization or a church under the tax code.

In that period, CWF's disbursements overwhelmingly went to one family. CWF paid family members unsubstantiated salaries. It also paid for family members' Prada handbags, jewelry, furs, Chanel fragrances, and private boat payments; paid for cruises and trips to Disneyland, Hawaii, and Paris; paid for golf outings, spa visits, dining out, and event tickets; paid for home im-

provements for family members; and disbursed money to family members as "gifts," "reimbursements," "loans," checks for "taxes," and "benevolence." There is no genuine issue of material fact; CWF is not entitled to tax-exempt status, and the government is entitled to summary judgment.

## I.     Background

### A.     The history of CWF's tax status

#### 1.     CWF was founded as a nonprofit organization

Lester Goddard founded CWF in 1998 when he and his family decided to leave the Foursquare megachurch in Oregon to start their own religious organization. ECF No. 64 at 11:16-12:9; ECF No. 60-2 at 1-2. CWF was incorporated in Oregon as a nonprofit corporation under 26 U.S.C. § 501(c)(3). ECF No. 1 at 2 [¶3]. CWF was "organized exclusively for … religious … purposes"; its articles of incorporation and bylaws prohibited anyone from using its net earnings to "inure to the benefit of, or be distributed to, its officers, [council] members or other private persons." ECF No. 57-5 at 41-42 (articles V-VI); ECF No. 57-3 at 20 (bylaws).

CWF began with sixteen active members, all former members of the Foursquare church. ECF No. 57-3 at 16; ECF No. 60-2 at 2. Lester Goddard served as CWF's main pastor, and Ryan Goddard, his son, served as CWF's part-time youth and associate pastor. ECF No. 57-4 at 1293, 1296. Laura Goddard, Lester's wife, was also involved in the operation of CWF, taking on "full-time pastoral duties" alongside Lester. ECF No. 60-1 at 1-2.

In applying for federal tax-exempt status, CWF stated that its activities would consist of bible teaching, praise, worship, and prayer. ECF No. 57-3 at 7-18. CWF would be governed by an uncompensated council of elders. *Id.* at 9, 26; ECF No. 64 at 10:2-18. The council members included Laura Goddard, Ryan Goddard, and others who were not initially related to the Goddards; the others later joined the Goddard family through marriage. ECF No. 64 at 10:10-11:4, 54:3-13.

CWF's revenue would be generated exclusively from tithes and offerings—tax-deductible donations—contributed by its members. ECF No. 57-4 at 1299. CWF attested that it qualified as both a 501(c)(3) tax-exempt organization and a "church" for tax purposes under 26 U.S.C. § 170(b)(1)(A)(i). ECF No. 57-3 at 12.

The IRS approved CWF's application, exempting it from federal tax as a 501(c)(3) organization and granting it church status under the tax code. ECF No. 57-3 at 46-48.

### 2.    The IRS reexamined CWF's tax-exempt status

More than a decade later, the IRS began to question whether CWF was adhering to the tax-exemption requirements. *See* ECF No. 57 at 6. In September 2016, the IRS sent CWF a church tax inquiry notice. ECF No. 57-3 at 50-55. The notice explained that the IRS was concerned that "the church's assets inured to the benefit of [its] pastors for personal use" and that CWF "facilitated the unreporting of income by enabling church members to deduct amounts contributed and by returning the amounts received as charitable contributions back to church members." *Id.* at 50.

CWF did not respond to the notice, and the IRS issued a church tax examination notice. ECF No. 57 at 6-7; ECF No. 57-3 at 96-97. When CWF again did not respond, the IRS selected CWF for an audit. ECF No. 57 at 7; ECF No. 57-3 at 109-10. The IRS sent inquiries and requested records concerning CWF's finances and expenses, membership, banking, and tax returns covering tax years 2013 through 2016. ECF No. 57-3 at 111; ECF No. 57-4 at 779, 1103, 1109, 1257, 1261.

In December 2018, the IRS issued a final letter revoking CWF's tax-exempt status under section 501(c)(3), effective August 2012, so CWF was not entitled to tax-exempt status for tax years 2013 through 2016. ECF No. 57-4 at 1288-89, 1292-1314. The IRS explained that (1) at least part of CWF's earnings inured to the benefit of its members; (2) CWF operated for the benefit of the private interests of its members; and (3) CWF was not a church within the meaning of the tax code. *Id.* at 1288.

The IRS explained that, during tax years 2013 through 2016, CWF's membership "primarily consist[ed] of Lester Goddard and his immediate and extended family." ECF No. 57-4 at 1296. CWF "received its revenue solely from tithes and offerings"—tax-exempt donations from its members—and then disbursed that revenue back to its members for their personal benefit and private use. *Id.* at 1299-1300, 1304, 1307-11. Over the four years, CWF received $1,093,560 in net deposits. *Id.* at 1304, 1311. CWF spent $1,083,688 of that money. *Id.* Of that, approximately $950,000 was traceable as checks to individuals. *Id.* at 1304, 1309-11. Of the $950,000 in checks, approximately $933,000, or 98 percent, was disbursed to the Goddard family: Lester and Laura Goddard, their children and children's families, and Berit Homes, Ryan Goddard's for-profit construction business. *Id.* at 1308-10. And Lester and Laura Goddard alone received approximately $784,000 of the total check disbursements. *Id.* at 1310. CWF funds were also used to pay off Lester and Laura Goddard's personal credit card. *Id.* at 1311.

CWF used its credit card to spend the rest of the $1,083,688 in expenses. ECF No. 57-4 at 1304, 1310-11. Lester and Laura Goddard were the only authorized users of that card, and it was used to purchase flights, cruises, hotel stays, and resort stays in, among other places, Hawaii, Paris, and Disneyland; golf outings; meals at restaurants; jewelry, handbags, and furs; event tickets; groceries; private loans; and home renovations. *Id.* at 1302-03, 1310.

CWF did not provide any evidence that any of those credit card charges were for church-related expenses or that the checks or payments issued directly to members were used for tax-exempt purposes. ECF No. 57-4 at 1303, 1310-11.

The IRS found that the funds disbursed to individual members constituted private inurement. ECF No. 57-4 at 1301-04, 1310-11. The IRS explained that Lester and Laura Goddard had "complete control over CWF's bank account as well as the overall financial affairs of CWF" and

used that control to "authorize[] church disbursements to personally benefit themselves and … CWF members." *Id.* at 1310-11.

The IRS acknowledged that, of the approximately $784,000 in checks disbursed to Lester and Laura Goddard, CWF identified about 69 percent as compensation. ECF No. 57-4 at 1310. But, the IRS noted, Lester and Laura Goddard had "the ability to issue church disbursements at their discretion, including Lester Goddard's pastoral compensation." *Id.* Although the membership at least nominally agreed to Lester Goddard's compensation, the IRS determined that "the independence of CWF's membership appear[ed] to be impaired" because most members were related to the Goddards. *Id.* Regardless, the IRS determined that other funds, not identified as compensation, were disbursed to CWF members for their private use. *Id.* at 1310-11.

### 3. Before the audit was finalized, CWF was dissolved and reincorporated

In November 2018, a month before the IRS issued its final decision, CWF was administratively dissolved as an Oregon corporation and incorporated as a new organization with the same name in Hawaii. ECF No. 57-5 at 46, 49-50. There is no evidence that the Hawaii CWF corporation applied for or was granted federal tax-exempt or church status. *See* ECF No. 57 at 9.

### B. CWF filed suit in this court challenging the IRS's decision

On March 17, 2019, CWF filed a complaint in this court challenging the IRS's decision. ECF No. 1. After discovery was long delayed, partly due to the covid pandemic (*see* ECF Nos. 12-49), the case was transferred to me in October 2024 (ECF No. 51). Discovery ended, and the government now moves for summary judgment, arguing that there is no genuine issue of material fact, and CWF qualifies for neither 501(c)(3) status nor church status. ECF No. 57. The parties briefed the motion, and the court held an oral argument in August 2025.

## II.     Discussion

Congress granted this court jurisdiction to hear challenges to IRS determinations regarding "the initial qualification or continuing qualification" of an organization as tax exempt under section 501(c)(3) or "any revocation of or other change in [that] qualification." 26 U.S.C. §§ 7428(a)(1)(A), (a)(2); *see also* 28 U.S.C. § 1507 (This court "shall have jurisdiction to hear any suit for and issue a declaratory judgment under section 7428."). The court has the authority to "make a declaration" with respect to those IRS determinations, even when the plaintiff is not seeking money damages. 26 U.S.C. § 7428(a)(2); *see Baptist Hospitals, Inc. v. United States*, 851 F.2d 1397, 1400-01 (Fed. Cir. 1988) (holding that "the IRS denial of tax exempt status created an actual controversy" allowing for the plaintiff's standing and for claims court review (quotation marks omitted)); *see also United States v. Mitchell*, 463 U.S. 206, 216 n.15 (1983). The court's jurisdiction in this context is concurrent with both the tax court and the D.C. district court. 26 U.S.C. § 7428(a)(2).

This court has applied a complicated standard of review for IRS revocation determinations. Even though there is an administrative record supplied by the IRS, the court applies de novo review and makes an independent declaration about whether to revoke tax-exempt status. *Foundation of Human Understanding v. United States*, 88 Fed. Cl. 203, 212 (2009), *aff'd*, 614 F.3d 1383 (Fed. Cir. 2010). As this court has explained, the statute supports de novo review because it "does not require the court to review the Secretary's determination directly, but rather compels the court to make a declaration as to the qualification itself." *New Dynamics Foundation v. United States*, 70 Fed. Cl. 782, 794 (2006); *see* 26 U.S.C. § 7428(a)(2) (authorizing the court to "make a declaration" with respect to the plaintiff's tax status). Thus, under the statute, this court decides in the first instance, without deference, whether to revoke a taxpayer's tax-exempt status. *See New Dynamics*,

70 Fed. Cl. at 794-95; *see also Foundation of Human Understanding*, 614 F.3d at 1389-90 (affirming this court's decision, stating that neither party disputed that the claims court was reviewing the IRS's revocation for whether it was "erroneous").

On the other hand, the statute requires a taxpayer to "exhaust[] administrative remedies available to it within" the IRS before filing suit here. 26 U.S.C. § 7428(b)(2). It would be wasteful for this court, acting after a taxpayer has exhausted administrative remedies, to ignore the administrative record and facts found by the IRS.

To square those competing priorities, this court has explained that its otherwise de novo review includes applying a "presumption of correctness" to the facts that the IRS found. *New Dynamics*, 70 Fed. Cl. at 795; *see Lima Surgical Associates, Inc. v. United States*, 944 F.2d 885, 888 (Fed. Cir. 1991) (explaining that "determinations of the Commissioner of Internal Revenue are presumptively correct"); *see also Family Trust of Massachusetts, Inc. v. United States*, 892 F. Supp. 2d 149, 154 (D.D.C. 2012) (stating that even when conducting de novo review, the court assumes the facts in the administrative record are true, following the tax court rules), *aff'd*, 722 F.3d 355 (D.C. Cir. 2013). The presumption of correctness is different from the substantial evidence standard applied in review of other agency decisionmaking under the Administrative Procedure Act. The standards have something in common: Both involve giving weight to determinations already made by the agency. But under the presumption of correctness, the presumption applies only until the taxpayer comes forward with evidence that the agency was wrong. *United States v. Janis*, 428 U.S. 433, 440-42 (1976). The court here looks at facts already found by the IRS, applying a presumption of correctness until the plaintiff comes forward with evidence to rebut the IRS's facts.

The court may also consider evidence outside the administrative record when reviewing an IRS revocation decision, if "the parties do not agree that such record contains all the relevant facts and that such facts are not in dispute." *Educational Assistance Foundation for the Descendants of Hungarian Immigrants in the Performing Arts, Inc. v. United States*, 904 F. Supp. 2d 95, 101 (D.D.C. 2012) (internal quotation marks omitted).

In sum, this court's determination in reviewing an IRS revocation decision involves applying a presumption of correctness to the facts found by the IRS, contained in the administrative record, while also accepting new evidence and looking at that evidence without deference. If the new evidence might affect the conclusion, the court does not defer to the IRS's bottom-line conclusion. *New Dynamics*, 70 Fed. Cl. at 795; *Church of Visible Intelligence That Governs The Universe v. United States*, 4 Cl. Ct. 55, 60 (1983); *see also Kappos v. Hyatt*, 566 U.S. 431, 438 (2012) (explaining that, when a court reviews an agency decision but hears new evidence under a statute that allows for new evidence, "it makes little sense for the … court to apply a deferential standard of review to [agency] factual findings that are contradicted by the new evidence"); *Salwan v. Iancu*, 825 F. App'x 862, 865 (Fed. Cir. 2020) (explaining that, under *Hyatt*, in a type of proceeding that allows for new evidence, if "the parties agree to proceed on the administrative record," the court reviews factual findings for substantial evidence, under the Administrative Procedure Act).

Under the presumption of correctness, the taxpayer bears the burden of establishing that it is entitled to tax-exempt status and that the IRS's revocation decision was wrong. *Foundation of Human Understanding*, 88 Fed. Cl. at 212-13; *Easter House v. United States*, 12 Cl. Ct. 476, 482 (1987) (following tax court rules, and thus presuming that "facts in the administrative record are deemed true and that the plaintiff / taxpayer has the burden of proving that the IRS determination was wrong"), *aff'd*, 846 F.2d 78 (Fed. Cir. 1988).

The court may grant summary judgment when the movant establishes that the record does not contain a "genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Rules of the Court of Federal Claims, Rule 56(a). When reviewing a motion for summary judgment, "the judge's function is not … to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248-49 (1986). A dispute is genuine when the evidence could lead a factfinder to reasonably resolve that issue "in favor of either party." *Id.* at 250. A fact is material if it might "affect the outcome of the suit under the governing law." *Id.* at 248. Where a fact is ambiguous, the court draws all justifiable inferences in the non-movant's favor. *Id.* at 255.

But the movant's burden may "be discharged by showing … that there is an absence of evidence to support the nonmoving party's case*." Sweats Fashions, Inc. v. Pannill Knitting Co.*, 833 F.2d 1560, 1563 (Fed. Cir. 1987) (cleaned up); *see Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986). To defeat the motion, the non-moving party must produce evidence to "show an evidentiary conflict on the record; mere denials or conclusory statements are not sufficient." *Mingus Constructors, Inc. v. United States*, 812 F.2d 1387, 1390-91 (Fed. Cir. 1987).

### A.    At least some of CWF's net earnings inured to the benefit of private individuals

To qualify under section 501(c)(3), a religious organization must be organized and operated exclusively for religious purposes. 26 U.S.C. § 501(c)(3); 26 C.F.R. § 1.501(c)(3)-1(a)(1). IRS regulations thus apply two tests: (1) an organizational test and (2) an operational test. 26 C.F.R. § 1.501(c)(3)-1(a)(1). An organization must meet both to have tax-exempt status. *Easter House*, 12 Cl. Ct. at 483; *Church of Visible Intelligence*, 4 Cl. Ct. at 61; *see also* 26 C.F.R. § 1.501(c)(3)-1(a)(1). The IRS's revocation decision in this case and the government's motion

address only the operational test, arguing that CWF failed it. ECF No. 57-4 at 1288; ECF No. 57 at 24-30.

Under the operational test, an organization must operate "exclusively for one or more exempt purposes" by engaging "primarily in activities which accomplish one or more" exempt purposes; no "more than an insubstantial part of its activities" may be conducted in furtherance of a non-exempt purpose; and none of its net earnings may "inure in whole or in part to the benefit of private shareholders or individuals." 26 C.F.R. § 1.501(c)(3)-1(c)(1), (2). As phrased in the statute, "no part of the net earnings" of the organization may "inure[] to the benefit of any private shareholder or individual." 26 U.S.C. § 501(c)(3). "[T]he term 'no part' is absolute. The organization loses tax exempt status if even a small percentage of income inures to a private individual." *Church of Scientology of California v. Commissioner*, 823 F.2d 1310, 1316 (9th Cir. 1987); *see Founding Church of Scientology v. United States*, 188 Ct. Cl. 490, 496-97 (1969), *cert. denied*, 397 U.S. 1009 (1970); *Freedom Church of Revelation v. United States*, 588 F. Supp. 693, 697-98 (D.D.C. 1984) ("The amount or extent of the inurement or benefit is not relevant.").

Here, the IRS concluded that at least some of CWF's net earnings inured to the benefit of its members. ECF No. 57-4 at 1288. The government argues that the administrative record establishes, and there is no genuine issue of material fact, that the IRS's conclusion was correct. ECF No. 57 at 24-30. Also, according to the government, none of CWF's new evidence could undermine the IRS's conclusion. *See* ECF No. 61 at 1, 3-5 (arguing that evidence of charitable activities would not "balance out" the evidence that the majority of CWF's funds were disbursed to the Goddards for their personal use because "the private inurement test is an on-off switch, not a scale"); *id.* at 10-12 (arguing that Laura Goddard's declaration does not create a genuine dispute of material fact).

CWF responds that the government relies on "a selective and misleading characterization of CWF's operations that ignores substantial evidence of legitimate religious activity" and "a mis-application of the private inurement doctrine that would punish standard practices in small religious organizations." ECF No. 60 at 1; *see id.* at 28-41. "Even if the Court were to find some technical deficiencies in documentation or procedures," according to CWF, "CWF's operations served genuine public charitable and religious interests rather than private benefit." *Id.* at 34.

The IRS correctly determined that at least some of CWF's net earnings were disbursed to its members—particularly members of the Goddard family—inuring to their personal benefit during tax years 2013 through 2016. CWF does not dispute the IRS's relevant findings or calculations.

### 1.    Much of CWF's spending went to the Goddards

As the IRS found, Laura Goddard manually recorded the donations CWF received in a notebook. ECF No. 57-4 at 787-88, 1299. Someone from CWF then transferred those numbers to a computer to prepare members' annual contribution statements. *Id.* at 1299. According to Lester Goddard, members usually made contributions by check; CWF did not keep consistent records of cash contributions. *Id.* at 788, 1299. This table summarizes the IRS's findings regarding CWF's net earnings and disbursements made by check or credit card.

| Calendar Year Summary | | | | | | |
|---|---|---|---|---|---|---|
| | 2013 | 2014 | 2015 | 2016 | Total | Percentage of Net Deposits |
| **Tithes:** | | | | | | |
| Net Deposits | 243,120 | 275,792 | 322,986 | 251,662 | **1,093,560** | |
| **Disbursements:** | | | | | | |
| Checks to or on behalf of individuals for personal purposes | 63,440 | 50,195 | 52,060 | 27,864 | 193,559 | 18% |
| Compensation Paid to Lester Goddard | 135,600 | 186,100 | 197,300 | 136,440 | 655,440 | 60% |
| Compensatoin Paid to Ryan Goddard | 19,600 | 21,700 | 26,700 | 32,500 | 100,500 | 9% |
| American Express | 20,503 | 24,380 | 40,615 | 34,737 | 120,236 | 11% |
| Chase | 4,930 | 0 | 2,124 | 6,900 | 13,953 | 1% |
| **Total:** | **244,073** | **282,375** | **318,799** | **238,441** | **1,083,688** | 99% |
| Difference of Tithes over Disbursements | (953) | (6,583) | 4,187 | 13,221 | 9,872 | |

ECF No. 57-4 at 1304. As shown in the table, CWF disbursed all but about $10,000 of its total income in the tax years at issue.

According to the IRS's findings, which CWF does not dispute, checks to the Goddard family, including compensation for Lester and Ryan Goddard, accounted for 98 percent of CWF's disbursement checks during the four years at issue. The IRS found that at least some of that money inured to the benefit of the Goddards personally, and at least some of the credit card payments were also made for non-exempt purposes to benefit the Goddards personally. *See id.* at 1301-34; *supra* Part I.A.2; *infra* Part II.A.3.

2. **CWF disbursed an unexplained and large percentage of its income as compensation for Lester and Ryan Goddard, without backstops outside the family, constituting private inurement**

CWF argues that the court should not factor in Lester and Ryan Goddard's salaries, their housing stipends, or CWF's operating costs, which account for most of CWF's expenses. According to CWF, "reasonable salaries to church officials do not constitute private inurement." ECF No. 60 at 28-38 (quoting *Bubbling Well Church of Universal Love v. Commissioner*, 670 F.2d 104, 105 (9th Cir. 1981)); *see id.* at 34 (citing *Church of Scientology of California*, 823 F.2d at 1316).

CWF is correct that employee compensation and other "ordinary and necessary expenditures" an organization incurs "in the course of its operations" do not constitute private inurement and do not jeopardize the organization's tax-exempt status. *Founding Church of Scientology*, 188 Ct. Cl. at 496. But the "compensation" label an organization applies to its payments does not control the analysis. *See Accardi v. Pennsylvania Railroad Co.*, 383 U.S. 225, 230 (1966) (stating that a "label … cannot obscure" the "real nature" of a payment).

The IRS's findings here show that the Goddards led and controlled CWF and determined their own compensation, and CWF has not provided any contrary evidence. CWF's council of

elders, which allegedly had input into some financial matters, consisted of Laura and Ryan Goddard and extended relatives of the Goddards: Mike and Rose Ree (the parents of a daughter-in-law of the Goddards), Carmen Wagner (the mother of a son-in-law of the Goddards), and Noe and Kathy Saison (the parents of another son-in-law of the Goddards). ECF No. 64 at 10:5-11:4, 34:19-35:8. Although those people made up a council, the IRS determined that the council did "NOT possess any authority over [Lester] Goddard or [CWF] overall." ECF No. 57-4 at 787. Instead, the IRS found, Lester and Laura Goddard controlled CWF's finances. And CWF had no conflict-of-interest policy. *Id.* at 787-88 (Lester Goddard explaining that CWF did not have or abide by internal controls); *id.* at 1296-97.

CWF had only two formal employees—Lester and Ryan Goddard—and neither signed a written employment contract. ECF No. 57-4 at 1103, 1105, 1301; ECF No. 64 at 29:18-30:4. Laura Goddard was not a formal employee of CWF, but Lester's salary included compensation for Laura's work for CWF. ECF No. 57-4 at 1296, 1301; ECF No. 60-2 at 6; ECF No. 64 at 30:5-15. CWF did not have written policies or procedures for setting either Lester or Ryan Goddard's compensation. ECF No. 57-4 at 787, 1301; ECF No. 64 at 34:15-18.

Lester Goddard explained that for each year during the audit period, he would determine what his salary and bonus should be and then would present those numbers to CWF's members for approval. *Id.* at 32:5-33:1 ("We would ask them if it was okay and they either said yes or no."). Lester admitted that he alone approved his 2016 bonus. ECF No. 57-4 at 788. Because CWF did not provide any information that would demonstrate otherwise, the IRS concluded that Lester "sets his own salary, including bonuses." ECF No. 57-4 at 787, 1301. Ryan Goddard's salary and bonuses were determined by "the heads," or council, of CWF: the extended Goddard family of Lester

and Laura, the Rees, the Wagners, and the Saisons, who presented those numbers to CWF's members for approval. ECF No. 64 at 33:18-35:8.

CWF did not explain its compensation decisions or explain the work Lester or Ryan Goddard did in return for that compensation. CWF did not keep contemporaneous records or provide the IRS with documentation of their daily duties, ministerial activities, or the services they performed. ECF No. 57-4 at 788; ECF No. 64 at 21:9-17, 25:12-15, 55:10-56:1. CWF provided only a list, made after the fact, of lifecycle rituals: one wedding, an unstated number of baptisms, and seven baby dedications. And all but one of those rituals were for members of the Goddard family. ECF No. 57-4 at 788, 1298; ECF No. 64 at 56:13-57:14 (stating that only one of the baptisms performed was for a non-relative and that the only wedding performed was for Lester Goddard's daughter); *id.* at 91:6-92:10 (stating that all seven baby dedications were performed for relatives).

Based on the IRS's findings, the Goddards' compensation alone would support a conclusion that CWF's activities inured to the private benefit of the Goddard family. In *Bubbling Well*, the Ninth Circuit affirmed a tax court determination that an organization's compensation to employees was private inurement. 670 F.2d at 105. There, as here, a single family constituted the organization's only employees and directors. *Id.* There, as here, family members determined the salaries of their relatives who served as ministers. *Id.* And, as here, there was no evidence of the work the employees performed in exchange for compensation. *Id.* at 105-06.

That kind of familial control over the organization without evidence of work performed in return for compensation, the court held, created a potential for abuse and a form of private inurement. *Bubbling Well*, 670 F.2d at 105-06. Likewise, in *Family Trust of Massachusetts*, a district court concluded that a founder's compensation constituted private inurement because he had "complete and effective control" over the organization. 892 F. Supp. 2d at 156-57. The record in

that case presented no evidence, beyond assertions from the organization and its members, that the salary was reasonable. *Id.*; *see also Unitary Mission Church of Long Island v. Commissioner*, 74 T.C. 507, 515 (1980) (finding private inurement based on the combination of "control of financial decisions by individuals who appear to benefit personally from certain expenditures" and "little or no facts in the administrative record to indicate the reasonableness and appropriateness of the expenses"), *aff'd*, 647 F.2d 163 (2d Cir. 1981). The fact that Goddard family members alone determined their compensation and did not explain the reasons for the compensation is sufficient to agree with the IRS that the family's salaries constituted private inurement.

### 3. CWF disbursed money to its members—primarily the extended Goddard family—by paying for luxury goods, trips, events, and home improvements, constituting private inurement

Even if the Goddards' salaries could be considered reasonable, the IRS correctly determined that CWF disbursed other funds to its members for their personal use, independently showing private inurement. As an initial matter, 31 percent of disbursements made to Lester and Laura Goddard were not identified as compensation. ECF No. 57-4 at 1310. Those disbursements cannot be considered part of their salaries, yet they went directly to the Goddards.

Further, other disbursements went to other CWF members. CWF's members consisted almost entirely of immediate and extended members of the Goddard family. ECF No. 64 at 54:3-13; ECF No. 60-2 at 3, 5. The IRS summarized CWF's membership during the audit period, and the relationship of each member to the Goddards, in this table.

| Member Name | Relationship to Pastor Lester Goddard & His Children | Approximate Number of Adult | Approximate Number of |
|---|---|---|---|
| Lester (Sam) & Laura Goddard | Self & Laura (spouse) | 2 | |
| Aaron & Angela Goddard | Aaron son of Pastor Lester Goddard | 2 | 5 |
| Samuel & Alexis Goddard | Samuel son of Pastor Lester Goddard | 2 | 4 |
| Ryan & Heidi Goddard | Ryan son of Pastor Lester Goddard | 2 | 10 |
| Eric & Amanda Wagner | Amanda daughter of Pastor Lester Goddard | 2 | 4 |
| Noe & Elizabeth Saison | Elizabeth daughter of Lester Goddard | 2 | 1 |
| Carmen Wagner | Mother to Eric Wagner (son-in-law) | 1 | |
| Tawnya Vranlzan | Relative of Carmen Wagner | 1 | 3 |
| Jason & Nia Wagner | Jason is Eric Wagner's brother | 2 | 6 |
| Sarah (Rivers) Saison | Son-in-law's sister | 1 | 9 |
| Rosie (Re) Deflorio | Possible relative of Angela Goddard | 1 | 3 |
| Kathy Saison | Son-in-law's mother | 1 | |
| **Total Membership** | | **19** | **45** |

ECF No. 57-4 at 1296. Lester Goddard explained that not all CWF members were initially related to the Goddards, and CWF members married each other over time. ECF No. 64 at 54:3-13; 119:19-20. But during the tax years at issue, the IRS determined that the familial relationships existed. ECF No. 57-4 at 1296. Given those familial relationships, any disbursement to a member of CWF was almost always a disbursement to a member of the Goddard family.

As the IRS concluded, Lester and Laura Goddard oversaw and had ultimate control over CWF's finances—CWF's one bank account and one credit card. ECF No. 57-4 at 788-89, 1299, 1302-03, 1310. According to CWF, Rose Ree and Carmen Wagner also had authority to sign checks, with the intent of preventing abuse. ECF No. 60-1 at 5. But Laura Goddard was the primary account manager and signed nearly all of the checks in evidence. ECF No. 57-4 at 788-89 (IRS finding that Laura Goddard "reconciles the bank statement[s]" and "writes and issues all checks"); *id.* at 1104, 1346-1650 (hundreds of checks signed by Laura Goddard). Lester and Laura Goddard had exclusive authority over CWF's credit card. ECF No. 57-4 at 789, 1302. Thus, the Goddard family controlled CWF's disbursements.

CWF disbursed money to its members for luxury goods, travel, home improvements, private loans, and other unspecified expenses. *See* ECF No. 57-4 at 1299-1311. CWF did not have a

written policy for pre-approving disbursements or a process to ensure that the disbursed funds furthered a tax-exempt purpose. ECF No. 64 at 75:11-76:18, 119:4-16, 123:4-17, 133:10-13; ECF No. 57-4 at 789, 1301, 1303. CWF did not keep itemized receipts or record the nature of transactions. ECF No. 64 at 75:16-76:18, 83:11-84:6 (Lester Goddard explaining that CWF tracked expenses using "[j]ust the checks themselves"); *id.* at 120:4-8. But CWF does not dispute that the payments were made.

Under the Goddards' control, CWF's credit card statements show purchases at Nordstrom, Saks Fifth Avenue, David's Bridal, Fur Factory, and Macy's. ECF No. 57-4 at 1303; ECF No. 57-5 at 14; ECF No. 64 at 133:14-135:12, 143:10-18. CWF bought Prada handbags, $1,500 worth of jewelry from Whaler's Fine Jewelry, $1,050 worth of furs, and Chanel fragrances for the Goddard family. ECF No. 57-4 at 1065, 1068; ECF No. 57-5 at 5-18; ECF No. 64 at 123:14-17, 129:9-13, 135:8-12, 145:5-147:12, 156:8-17. CWF funds also paid for the Goddards' son Samuel's monthly boat payments, which Lester Goddard admitted was a personal expense. ECF No. 64 at 92:19-94:5 (answering "Yes, it would" when asked whether it would be a personal expense).

CWF paid for domestic and international travel, event tickets, and amusement park trips for members of the Goddard family. Paid for by CWF, family members went to Disneyland, Hawaii, and Paris, among other places. ECF No. 57-4 at 1065-68; ECF No. 57-5 at 5-32; ECF No. 64 at 100:14-18, 161:13-20, 163:6-15. CWF paid for rental cars, flights, cruises, and resort stays. ECF No. 57-5 at 5-18 (including JetBlue, United Airlines, Holland Cruise, Alamo Car Rental, and Bandon Dunes Resort). CWF also paid for golf outings, spa visits, and event tickets. *Id.* (including Sun River Recreation, Salishan Spa & Golf, Kapalua Golf, Locauto Rent Spa Nolmilano, and StubHub). According to CWF, some of the trips were CWF retreats. ECF No. 60-1 at 4. But CWF did not maintain any records documenting the nature or purpose of its retreats. ECF No. 64 at

58:17-59:2, 96:13-19, 143:3-9, 147:13-148:1, 163:6-13. As the Ninth Circuit explained in *Bubbling Well*, travel expenses, even when allegedly for church business, would require support such as "facts … to explain the relationship between the [organization] and the trip." 670 F.2d at 105.

CWF paid for its members to dine out at restaurants. ECF No. 57-4 at 1065, 1068, 1303; ECF No. 57-5 at 5-14 (including Ruth's Chris Steakhouse, Outback Steakhouse, and Kyllo's Seafood); ECF No. 64 at 135:18-136:12. Lester Goddard testified that CWF did not keep track of the purpose of those outings. He explained that dining out during a retreat "would have been part of just the time spent together." ECF No. 64 at 136:3-5.

CWF paid for home improvement projects for members of the Goddard family. CWF paid for renovations on Samuel and Alexis Goddard's home "to get it in a sellable condition" and avoid foreclosure. ECF No. 57-4 at 1068, 1105, 1303; ECF No. 57-5 at 5-18 (charges to Home Depot, Lumberyard, and Portland Sand & Gravel). CWF does not explain those payments as anything other than private benefits to the Goddard family. CWF also paid for Lester and Laura Goddard to install a playscape and pool slide at their house because "they host[ed] many gatherings." ECF No. 57-4 at 1065-67, 1105. Although church gatherings can be hosted at a member's home, that does not make home improvements a church expense. *See Manning Association v. Commissioner*, 93 T.C. 596, 608-10 (1989). Unlike the renovations done to transform Ryan Goddard's garage into a "worship space" when it was "established [as] a permanent worship location" for CWF (ECF No. 60-2 at 4; ECF No. 57-4 at 790), there is no evidence suggesting that the projects at Lester and Laura Goddard's home were for a tax-exempt purpose.

Those purchases of goods and services, without evidence that they were purchased for a tax-exempt purpose, constitute private inurement.

**4.    CWF paid members of the Goddard family in the form of gifts, loans, and other unexplained reimbursements, also constituting private inurement**

CWF paid for other aspects of its members' personal finances: CWF paid for "gifts," paid off a personal credit card, funded personal loans, gave unexplained "reimbursement" payments to members, disbursed "benevolence" or charity payments to its members, and financed a private debt reduction program.

Laura Goddard signed checks from CWF labeled as "gifts" to CWF members. One was a $1,000 check to Berit Homes, the construction company owned by the Goddards' son. ECF No. 57-5 at 19; ECF No. 57-4 at 1387. When asked about the gift to Berit Homes, Lester Goddard could not explain the purpose of the check. ECF No. 64 at 120:14-20. Laura Goddard also signed a $200 "gift" check to "Heather Re[e]" (ECF No. 57-4 at 1622) and a $125 check for "house cleaning + 75.00 gift" to Angela Goddard (*id.* at 1442).

CWF spent nearly $14,000 to pay off Lester and Laura Goddard's personal credit card. ECF No. 57-4 at 1304; *see* ECF No. 64 at 114:10-118:18. Lester Goddard stated that the payments from CWF's bank account to his and his wife's personal credit card were part of their "payroll." ECF No. 64 at 117:10-13. But when the IRS asked him how payroll was applied to a personal credit card, Lester Goddard responded, "I don't know what to say." *Id.* at 117:14-17.

CWF issued checks, totaling $85,400, to Lester or Laura Goddard for "taxes" or "loan for taxes." ECF No. 57-5 at 20, 23, 27. Another $2,500 went to Ryan or Heidi Goddard for taxes. *Id.* at 22. Those checks, Lester stated, "would be counted as a bonus just to help them pay out their taxes" or would be "paid … back as quickly as we could." ECF No. 64 at 107:13-108:16, 124:16-21. CWF provided no evidence that any of that money was paid back.

Lester Goddard explained that CWF's revenue was used "to front money" for its members with the expectation that the money would be paid back, but CWF did not record those loans or

any repayments. ECF No. 64 at 160:3-11. CWF did not have an application process or written criteria for issuing loans. *Id.* at 123:4-125:6. CWF did not require loan recipients to sign any written terms or conditions for repayment and did not document the loans' purposes. *Id.* at 124:3-15. Lester Goddard testified that personal loans were issued upon "an agreement with everybody involved," but he and Laura Goddard were usually the ones to authorize CWF's personal loans. *Id.* at 123:18-124:2. Lester admitted that CWF had been "doing things wrongly" by allowing members to use the CWF credit card for personal loans. *Id.* at 159:19-21.

CWF also gave "reimbursement" checks to Lester and Laura Goddard totaling over $5,000. ECF No. 57-5 at 21, 27, 31. CWF did not record the reasons for those reimbursements and had no documentation beyond the checks themselves. ECF No. 64 at 75:11-76:18, 82:10-84:6; ECF No. 57-4 at 789, 1301. Laura Goddard asserted that those reimbursements "would have been few and for nominal amounts for common church expenditures." ECF No. 60-1 at 3. But Lester Goddard admitted that CWF did not have a formal or written policy for pre-approving church-related expenses, for reimbursement procedures, or for ensuring that disbursed funds were used for tax-exempt purposes. ECF No. 64 at 75:11-76:18.

Laura Goddard also signed checks from CWF with blank memo lines, ranging in amounts from $100 to $19,000, to herself, to Lester, and to other Goddard family members. ECF No. 57-4 at 875, 1418; ECF No. 57-5 at 5-32. CWF did not document the nature or purpose of those payments, and Lester Goddard could not explain them. ECF No. 64 at 94:6-12, 97:14-20.

CWF gave Lester and Laura Goddard's son and daughter-in-law so-called benevolence payments when they were experiencing financial challenges. ECF No. 57-4 at 1105. Laura Goddard also issued a CWF check to help Rose Ree—a CWF member who was a member of the council and was related to the Goddards through marriage (*id.* at 1296; ECF No. 66 at 33:17-35:18;

*see* ECF No. 60 at 5, 13, 21)—pay for her child's academic tutor. ECF No. 64 at 94:13-96:4. When asked whether recipients of benevolence payments were related to him, Lester Goddard responded that "[m]ost of the people in [CWF], as you know, are related to me" and explained that although "anybody on the street" was eligible to receive benevolence payments, the charity program was known only by "word of mouth." *Id.* at 119:9-21. CWF asserts in its brief that charity was available to anyone in need, but it provides only one example of CWF providing charitable giving to someone who might not have been a relative of the Goddards, the Ogden family. ECF No. 60 at 10-11, 32-33. CWF does not dispute that the other benevolence payments went to Goddard family members. *E.g.*, ECF No. 64 at 119:17-20.

CWF did not have a policy or procedure for authorizing benevolence payments. ECF No. 64 at 119:4-20. There was no application process, no requirement to show evidence of financial hardship, and no procedure for authorizing the payments. *Id.* at 119:4-120:13; *see also* ECF No. 60-2 at 3 ("Distribution was handled on a case-by-case basis, with no predetermined order in which money was given or distributed."). Without any recorded purpose, selection criteria, or evidence of need, the court presumes that the IRS was correct in concluding that CWF's benevolence payments constituted private inurement. *See Church in Boston v. Commissioner*, 71 T.C. 102, 106-07 (1978) (explaining that sparse documentation of "grants" precluded the IRS "from determining whether the grants were made in an objective and nondiscriminatory manner and whether the distribution of such grants was made in furtherance of an exempt purpose").

In general, an organization that fails "to keep records adequate to determine the full nature of its operations"—including those "sufficient to show specifically its items of gross income, receipts and disbursements and show that it is entitled to the exemption"—cannot meet its burden "to show that its operations do not inure in part to the private benefit of its officers." *Church of*

*Gospel Ministry, Inc. v. United States*, 640 F. Supp. 96, 98-99 (D.D.C. 1986), *aff'd*, 830 F.2d 1188 (D.C. Cir. 1987).

Lester and Laura Goddard's complete control over disbursing the funds further supports the IRS's conclusion that CWF's funds inured to their personal benefit. "Unaccounted for diversions of a charitable organization's resources by one who has complete and unfettered control can constitute inurement." *Church of Scientology of California*, 823 F.2d at 1316.

CWF argues that, "[e]ven if the Court were to find some technical deficiencies in documentation or procedures," there is still enough evidence to show that "CWF's operations served genuine public charitable and religious interests rather than private benefit." ECF No. 60 at 34. But the test for inurement does not balance funds used for exempt purposes against funds used for non-exempt purposes. *E.g.*, *Founding Church of Scientology*, 188 Ct. Cl. at 496-97. Evidence of the appropriate use of some funds does not negate evidence of private inurement for other funds. *See Church of Scientology of California*, 823 F.2d at 1316.

Similar facts led this court's predecessor to hold that an organization's loans to private entities qualified as private inurement. In *Easter House*, Easter House issued loans to companies that employed or were controlled by Easter House's president. 12 Cl. Ct. at 488-89. Easter House, like CWF, did not document the loans' purposes, terms, conditions, or repayment schedules. *Id.* Without that evidence, the court concluded that Easter House's "net earnings inured to the benefit" of its president because using a tax-exempt organization "as a source of credit" is a form of private inurement. *Id.* at 487-89 (citing *Founding Church of Scientology*, 188 Ct. Cl. at 499, and *Unitary Mission Church*, 74 T.C. at 515). The court found it irrelevant whether the loans were repaid. *Id.* at 488. Here, because CWF did not have written criteria listing permissible purposes of loans, explaining how loan amounts would be determined, or explaining whether interest would be

charged, the record supports the IRS's conclusion that loans made to family members constituted private inurement. *See Unitary Mission Church*, 74 T.C. at 515; *see also Orange County Agricultural Society, Inc. v. Commissioner*, 893 F.2d 529, 534 (2d Cir. 1990).

There are good reasons for disallowing these sorts of loans from a tax-exempt organization. When a person gives money to a tax-exempt organization, he can claim an income tax deduction for that money. 26 U.S.C. § 170(a)(1), (c). When that revenue is then paid back to the private person, he avoids paying the income taxes he otherwise owes.

In sum, CWF's gifts, personal credit card payments, loans, reimbursements, and benevolence to its members constitute private inurement.

### 5. Lester Goddard conceded that CWF improperly disbursed funds for private purposes

Even absent all the other uncontroverted facts found by the IRS, Lester Goddard conceded that CWF improperly disbursed funds for private purposes. He stated that funds for Disneyland trips were personal and "should have been something that people did on their own," not paid for by CWF. ECF No. 64 at 100:14-19. He agreed that a check issued to his daughter for trip expenses in Hawaii was personal. *Id.* at 110:5-8. He agreed that a check issued to members of the Ree family, labeled "something for Maui," covered personal expenses "for them." *Id.* at 105:16-20. He agreed that travel expenses, purchases of fragrances and jewelry, and "gift" payments to Goddard family members were personal and should not have been made by CWF. *E.g.*, *id.* at 129:9-13, 141:9-18, 158:8-15 (jewelry purchase); *id.* at 140:11-18 (personal golf expense); *id.* at 135:8-12 (Chanel fragrances); *id.* at 141:2-7, 161:13-17 (purchases made while traveling in France). He admitted that a charge for Super Duck Tours "would be a personal transaction." ECF No. 64 at 139:15-19.

He stated that a charge at Consignment Northwest Beaverton was a personal purchase "[f]or Carmen Wagner." *Id.* at 142:9-20. And he stated that he "would have to say" several airline tickets and fees were or "would probably be personal." *Id.* at 148:8-19.

Lester Goddard also admitted that payments for his son's boat were personal expenses. ECF No. 64 at 92:19-94:5. Laura Goddard stated that CWF agreed to make the boat payments on her son's behalf because he "was unemployed" but also stated that the boat "was from time to time used by [CWF] for fellowship and retreats." ECF No. 60-1 at 3-4.

Even if the boat payments could be considered exempt, Lester Goddard's admissions that CWF used its funds for non-exempt purposes for the benefit of its members confirms the IRS's determination.

### 6. CWF's additional evidence does not controvert the IRS's evidence or create a genuine issue of material fact

CWF attaches two affidavits to its brief: one by Lester Goddard (ECF No. 60-2), and one by Laura Goddard (ECF No. 60-1). CWF's brief cites those affidavits and Lester Goddard's deposition transcript for all of its support. *See generally* ECF No. 60 (only twice citing the record elsewhere, and only for propositions that the parties agree on). But the affidavits do not create a genuine issue of material fact that CWF, during the audit period, used substantial portions of its funds to inure to the private benefit of its members. The affidavits do not dispute that at least some of CWF's earnings were disbursed for private use. They do not address the jewelry, handbags, or fragrances. Laura Goddard's affidavit admits that the check for Angela Goddard's airfare and hotel costs was not a charitable payment. ECF No. 60-1 at 4.

The affidavits also do not create a genuine issue of material fact because a "party cannot create an issue of fact by supplying an affidavit contradicting [its own] prior deposition testimony, without explaining the contradiction or attempting to resolve the disparity." *Sinskey v. Pharmacia*

*Ophthalmics, Inc.*, 982 F.2d 494, 498 (Fed. Cir. 1992), *abrogated in part on other grounds by Pfaff v. Wells Electronics, Inc.*, 525 U.S. 55 (1998); *see GBA Associates LP v. United States*, 171 Fed. Cl. 93, 105 (2024); *see also Church of Spiritual Technology v. United States*, 26 Cl. Ct. 713, 730 (1992) (The court is "not obligate[d] … to accept conclusory statements contradicted elsewhere in the record."), *aff'd*, 991 F.2d 812 (Fed. Cir. 1993). Unlike Lester Goddard's more specific deposition testimony, in which he admitted that CWF used some of its funds wrongly for private purposes, the affidavits make broad statements about the nature of CWF's transactions, do not explain individual purchases, and do not offer evidence to dispute any particular instance of private inurement. *See* ECF No. 60-1 at 3-5; ECF No. 60-2 at 10, 12.

Finally, the parts of those affidavits that discuss CWF's activities after the audit period (ECF No. 60-2 at 4-5, 7-12) are irrelevant to the court's analysis here. This court's review is limited to evidence from the audit period. *Foundation of Human Understanding*, 88 Fed. Cl. at 214-15.

*      *      *

In sum, the record before the IRS establishes that at least some of CWF's net earnings inured to the benefit of private individuals for their personal use in violation of 26 U.S.C. § 501(c)(3) and the corresponding regulations. None of CWF's arguments, and none of its additional evidence, rebuts that record. The government is therefore entitled to summary judgment that the IRS correctly revoked CWF's 501(c)(3) status.

## B. The court need not separately resolve whether CWF operated exclusively for an exempt purpose

Because at least some of CWF's net earnings inured to the benefit of private individuals, the court need not resolve whether CWF met the other parts of the operational test, including whether it operated exclusively for an exempt religious purpose. *See Easter House*, 12 Cl. Ct. at

483. But because the requirements overlap, "if part of an organization's earnings inure to the benefit of private individuals, the organization cannot be operating exclusively for exempt purposes." *Freedom Church of Revelation*, 588 F. Supp. at 697-98; *see American Campaign Academy v. Commissioner*, 92 T.C. 1053, 1068-69 (1989) ("[T]he prohibition against private inurement of net earnings appears redundant, since the inurement of earnings to an interested person or insider would constitute the conferral of a benefit inconsistent with operating exclusively for an exempt purpose.").

For both reasons—that the government only had to satisfy the inurement prong, and that satisfying the inurement prong satisfies the exempt-purpose prong—the court need not address further whether CWF operated exclusively for an exempt purpose.

### C. CWF is not a church

The parties argue about CWF's status as a church. The government argues that, independent of its 501(c)(3) status, CWF cannot qualify as a church under either of two established tests— a 14-factor test and an associational test. ECF No. 57 at 30-37. But the government points out that the court need not decide the church question if it decides that CWF did not operate for a tax-exempt purpose. ECF No. 66 at 9:22-10:18.

Congress intended the term "church" to have a more limited definition than a "religious organization" under section 501(c)(3). *Foundation of Human Understanding*, 614 F.3d at 1388. Thus, an organization with 501(c)(3) status may qualify as a church, but an organization without 501(c)(3) status cannot be a church under the tax code. *See id.*; *see also Bubbling Well*, 670 F.2d at 106 n.1 (declining to reach the church question because the organization was disqualified from 501(c)(3) status); Milan N. Ball, *What is a "Church" for Federal Tax Purposes?*, Congress.gov, (July 18, 2025), https://www.congress.gov/crs-product/IF12520 ("Churches must first qualify for federal income tax exemption under … Section 501(c)(3)."). And, while CWF asserts that it can

qualify as a church without 501(c)(3) status (ECF No. 60 at 17), the cases CWF relies on do not stand for that proposition. *See Church of the Visible Intelligence*, 4 Cl. Ct. at 64 (explaining that "[i]t is generally accepted that Congress intended a more restricted definition for a 'church' than for a 'religious organization'"); *Foundation of Human Understanding*, 614 F.3d at 1388 (same). Thus, for tax purposes, CWF cannot qualify as a church.

### D. Religious freedom considerations do not warrant a different outcome

CWF argues that, to comply with the First Amendment, the court must resolve factual disputes in favor of religious autonomy rather than government oversight. ECF No. 60 at 3, 16-17, 19. CWF is correct that the court must not interfere with a taxpayer's First Amendment rights by judging the legitimacy of the taxpayer's religion. *Foundation of Human Understanding*, 88 Fed. Cl. at 215-16. But the court can and must review a taxpayer's tax-exempt status without evaluating the sincerity of its religious beliefs. *Id.* Neither the IRS, nor the court here, has evaluated the sincerity of CWF's or its members' religious beliefs. *Cf. Church of Visible Intelligence*, 4 Cl. Ct. at 65. And because there are no genuine factual disputes, there is nothing to resolve in favor of CWF's religious autonomy. First Amendment considerations do not alter the court's conclusion.

CWF also argues that a focus on family relationships within the organization risks harming any religious organization in which family relationships exist among members. ECF No. 60 at 1; *see id.* at 13-14. A church consisting of only family members is not a church for tax purposes under the Federal Circuit's associational test. *See Foundation of Human Understanding*, 614 F.3d at 1389 (taking for granted that, for tax purposes, a church must have "a body of followers beyond the scope of a family church" (quotation marks omitted)); *see also Church of Visible Intelligence*, 4 Cl. Ct. at 65. Although the Ninth Circuit explained in *Bubbling Well* that familial relationships among the organization's controlling members do not automatically undermine its 501(c)(3) status, those relationships mean that the organization is required to provide evidence that payments

to the members of that family are reasonable. 670 F.2d at 105. Here, CWF has not done that. Thus, the IRS was correct to look at CWF's family relationships in reexamining its tax status.

## III.    Conclusion

The court **grants** the government's motion for summary judgment. The court **declares** that the IRS correctly revoked CWF's tax-exempt status under 26 U.S.C. § 501(c)(3) and therefore also correctly revoked CWF's church status during the period at issue. The clerk of the court shall enter judgment for the government.

**IT IS SO ORDERED.**

/s/ Molly R. Silfen
MOLLY R. SILFEN
Judge